UNITED STATES of America,
Plaintiff-Appellee,

v.

John RANZONI (83–1518), and Robert
Cuddeback (83–1590),
Defendants-Appellants.

Nos. 83–1518, 83–1590.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1984.

Decided April 26, 1984.

Armand D. Bove, argued, St. Clair Shores, Mich., for defendant-appellant in 83–1518.

Leonard R. Gilman, U.S. Atty., Michael J. Lavoie, argued, Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Dennis N. Powers, argued, Highland, Mich., for defendant-appellant in 83–1590.

Before KENNEDY, Circuit Judge, PECK, Senior Circuit Judge, and UN-THANK, District Judge.*

PECK, Senior Circuit Judge.

John Ranzoni and Robert Cuddeback were convicted at a jury trial of violating 18 U.S.C. § 2315 by receiving, bartering, concealing and selling liquor, which each knew was stolen from an interstate shipment. After their motions for a new trial were denied, each appealed.

On August 20, 1982, two truckloads of alcoholic beverages owned by Mohawk Liquor departed Novi, Michigan bound for out-of-state destinations, including Erie and Youngwood, Pennsylvania. En route, the truckloads of liquor were stored for the night at a warehouse owned by Transportation Services, Inc. (TSI), located in Brownstown Township, Michigan. On August 22, 1982, after the first truck had departed, the designated driver of the second truck appeared at the TSI warehouse to continue the journey to Pennsylvania. He discovered, however, that the truckload of liquor had been stolen.

Upon learning of the theft, Anthony J. Pellegrino, president and owner of TSI, contacted Special Agent Jess Lopez of the FBI and informed him of the theft. He also told Lopez that he would offer a reward of $5,000 (later raised to $10,000) for information concerning the whereabouts of the stolen liquor.

At about the same time Ranzoni received a telephone call from one Bob Carr. According to Ranzoni's testimony, Carr stated that he had received a truckload of liquor, consisting of 600 cases of alcoholic beverages, including mostly Kahlua, from an individual who wished to secretly sell the liquor and then report it as stolen to his insurance company. Ranzoni agreed to help Carr dispose of the liquor, paying Carr $1,000. Ranzoni initially sold 200 cases of the alcoholic beverages to an unnamed third party, but ran into difficulties trying to dispose of the remainder. Between September 7 and 14, 1982, Ranzoni telephoned Cuddeback, the owner of Bob's Hideaway, a bar located in Westland, Michigan. Ranzoni, after telling Cuddeback about the available liquor, apparently assured Cuddeback it was not stolen. Cuddeback, however, declined to purchase the liquor.

Shortly thereafter, Cuddeback spoke by telephone with Ed Morelli, the former operator of a nearby bar, Ma Bell's, concerning a debt that Morelli owed a friend of Cuddeback. After assuring Cuddeback that the debt would be paid, Morelli inquired if Cuddeback knew of any "good deals" in the area. Thinking that Morelli sought to purchase a bar, Cuddeback stated that he knew of no bars available for sale. Morelli, declaring that he was short of cash, stated that he meant not just a bar, but anything that could make some money. Cuddeback then told Morelli about the Ranzoni offer of "liquor at a good price." Morelli stated that he was interested and asked Cuddeback to check further into the matter.

Morelli, who had been an FBI informant on several occasions, last in 1979, telephoned his old friend, Special Agent Jess

---

* Honorable G. Wix Unthank, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Lopez, informing Lopez of the liquor offer. Lopez told Morelli to set up a meeting involving Cuddeback, Ranzoni and himself to arrange a possible purchase.[1] That evening Cuddeback met with Morelli and Lopez at Bob's Hideaway to discuss the liquor transaction. Morelli indicated to Cuddeback that he could not make the purchase himself, due to his financial condition, but that his friend Lopez was interested in the deal. The three negotiated a price of $25 a case for the liquor which ordinarily sold for $100 a case. During the discussions Cuddeback stated to Lopez that Ranzoni had experienced great difficulty in disposing of the liquor since the "wrong truck was stolen" from the TSI warehouse.[2] Cuddeback contacted Ranzoni by telephone and obtained approval of the $25 a case purchase price. It was then decided that Lopez would come to Bob's Hideaway the next morning with the purchase money. Lopez would then pay Cuddeback once Lopez received word that his associates had taken possession of the liquor.

The next morning, September 24, 1982, Lopez, closely observed by several other FBI agents, entered Bob's Hideaway. At the same time, FBI agents prepared to meet with Ranzoni and his associates at the prearranged rendezvous point to receive the stolen liquor. At approximately 11:30 a.m. Lopez received a telephone call informing him that Ranzoni and his men had been arrested. Lopez thereupon arrested Cuddeback.

Ranzoni and Cuddeback, with two others,[3] were jointly indicted on one count of violating 18 U.S.C. § 2315. At trial, Ranzoni argued that he had not known the liquor was stolen, but instead thought he had been participating in an insurance fraud scheme. Cuddeback, while contending he had not known the alcoholic beverages were stolen, argued that he was entrapped

by Morelli, a government informant, who had implanted the desire to get involved in the overall liquor transaction in the mind of Cuddeback.

During the trial, defense counsel discovered that a reward had been offered by Pellegrino and that Morelli had received the reward. Defense counsel also sought the government's help in locating Bob Carr, hoping to use Carr as a defense witness. The government, however, stated that it would take some five days to locate Carr, and that the trial was already in progress. Defense counsel made no subsequent effort to inform the trial judge about Carr or seek a continuance.

At the close of the evidence the jury was instructed on the necessary elements for finding a violation of § 2315. The jury was also given the opportunity to consider Cuddeback's entrapment defense. After deliberation, the jury found Ranzoni and Cuddeback guilty.

On appeal, Ranzoni and Cuddeback argue that § 2315's jurisdictional requirement that the stolen liquor was moving in interstate commerce had not been met because the liquor had not crossed a state line prior to its theft from the TSI warehouse. Both appellants further argue that insufficient evidence was introduced to show that either knew the alcoholic beverages were stolen. In addition, they argue that the government, by failing to inform them about the reward and the fact that Morelli had received a reward for his services, as well as by its refusal to disclose the whereabouts of Bob Carr, prevented them from receiving a fair trial, in violation of their due process right as defined in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Finally Cuddeback argues he was entrapped as a

---

**1.** Lopez, Pellegrino, Morelli, and Morelli's attorney met several hours later. Lopez agreed that Morelli would receive the Pellegrino reward if their plan resulted in an arrest and the recovery of the stolen liquor.

**2.** Cuddeback indicated that a buyer had been located for the liquor aboard the first truck,

which consisted of Scotch, tequila, and wine, but that the truckload of liquor, actually stolen, consisting primarily of Kahlua, was far less popular in the marketplace.

**3.** Donald Covington and John Paros pled guilty and did not appeal.

matter of law, entitling him to an acquittal. After carefully considering each of these contentions we find them without merit and affirm the judgment of the district court *in toto.*

■ We initially turn to the question of whether the jurisdictional interstate commerce requirement of § 2315 was satisfied.[4] The government conceded that the stolen liquor had not left the state of Michigan at the time of its theft. This fact, they argue, is not controlling. Surprisingly few federal courts have considered the criteria for determining when goods are in interstate commerce for purposes of § 2315. In analyzing the question, the Eighth Circuit has adopted a flexible approach with an emphasis on practicality. *United States v. Henneberry,* 719 F.2d 941, 946 (8th Cir. 1983); *United States v. Singer,* 660 F.2d 1295, 1307–08 (8th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1030, 71 L.Ed.2d 314 (1982). Borrowing from prior case law interpreting the identical language of 18 U.S.C. § 659, which prohibits the theft of property in interstate commerce, the court, rather than focusing on the particular physical location of the theft, considered the overall indicia of interstate commerce then existing. These included the intent of the consignor, conveyance of the goods by an interstate carrier when stolen, and the out-of-state or in-state destination of the goods at the time of the theft, and subsequent concealment, attempted barter or actual sale. The court considered each factor separately, none of which was independently determinative. Congress's intent, the court continued, plainly was to adopt a practical, common sense approach, avoiding overly technical formulations.[5] The determination, overall, being factual, depends on the circumstances in a particular case. *Henneberry, supra; Singer, supra.* See also *United States v. Luman,* 624 F.2d 152, 155 (10th Cir.1980) (question of whether goods stolen are in interstate commerce for purposes of § 2315 a factual inquiry for the jury); *United States v. Tobin,* 576 F.2d 687, 691 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978) (same). *Cf. McElroy v. United States,* 455 U.S. 642, 659, 102 S.Ct. 1332, 1341, 71 L.Ed.2d 522 (1982) (question of whether goods in interstate commerce for purposes of § 2314 a jury consideration). Finding this test persuasive, we apply it to the facts in this case to determine whether the jury correctly found that the jurisdictional interstate nexus was satisfied in the present case.

4. Section 2315, in pertinent part, provides:
   Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken ...
       . . . .
   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both
       . . . .

5. The Supreme Court recently reached an identical conclusion interpreting similar language in 18 U.S.C. § 2314, prohibiting the transportation of a forged security in interstate commerce. *McElroy v. United States,* 455 U.S. 642, 659, 102 S.Ct. 1332 (1982). In *McElroy,* the petitioner, a resident of the state of Ohio, was convicted of forging a check and cashing it in the state of Pennsylvania. The court rejected petitioner's argument that the government was required to prove the check was forged before petitioner crossed into Pennsylvania in order to satisfy the statute's interstate commerce requirement. Justice O'Connor, writing for the Court, indicated that Congress intended interstate commerce, for purposes of § 2314, to include commerce even before a state border was crossed. *Id.* at 653–54, 102 S.Ct. at 1338–39. At the same time Justice O'Connor indicated that such a technical construction of interstate commerce was inappropriate as well for other federal criminal statutes including § 2315. *Id.* at 656 & n. 21, 102 S.Ct. at 1340. *See also United States v. Ajlouny,* 629 F.2d 830, 837 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981) (goods stolen from dock before shipped overseas are in foreign commerce for purposes of § 2314 violation despite the fact not crossed a national border); *United States v. Franklin,* 568 F.2d 1156, 1157 (8th Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978) (court interpreting identical language of 18 U.S.C. § 659 to that used in § 2315 found fact that goods had not crossed state line before stolen irrelevant; jurisdictional requirement met).

■ Here, even though the liquor was taken from the TSI warehouse before it left the state of Michigan, it plainly was being conveyed by interstate carriers on its journey to Pennsylvania. Mohawk Liquor of Novi, Michigan loaded the liquor aboard trucks and consigned it for sale in Pennsylvania. Bills of lading, as well as markings on the cases of liquor denoting approval of the Pennsylvania Liquor Control Commission for sale in Pennsylvania, evidenced Mohawk's intent. The fact that the liquor itself never reached Pennsylvania was due solely to unforeseen criminal intervention. Under the circumstances of this case, to hold that the liquor was not in interstate commerce because it never physically crossed a state border clearly would run counter to the intent of Congress to avoid technical and narrow constructions of § 2315. We therefore conclude that there was sufficient evidence for the jury to find that the liquor was moving in, a part of, or constituted interstate commerce, satisfying the jurisdictional requirement of § 2315.

Cuddeback and Ranzoni next assert that even if the liquor was moving in, a part of, or constituted interstate commerce, neither knew the alcoholic beverages were stolen. For his part Ranzoni contends that he believed he was participating in an insurance fraud, not proscribed by § 2315, rather than attempting to dispose of stolen property. Cuddeback argues that he believed assurances by Ranzoni that the liquor was not stolen.

■ Whether an individual knows property is stolen for purposes of § 2315 is clearly a question of fact reserved for jury consideration. *United States v. Bennett,* 665 F.2d 16, 23 (2d Cir.1981); *United States v. Francis,* 646 F.2d 251, 261 (6th Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981); *Luman, supra* at 157. On review, this court's inquiry is limited to a determination of whether sufficient evidence, considering the entire record read in the light most favorable to the government, supports the jury's finding of knowledge by each defendant.

*Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

■ According to the evidence at trial Ranzoni came into possession of the stolen liquor shortly after it disappeared from the TSI warehouse. During September 1982, Ranzoni was extremely eager to dispose of the liquor as soon as possible. Despite markings on the liquor, indicating it had been approved for sale in Pennsylvania, and having an approximate fair market value of $100 per case, Ranzoni was willing to sell it to Lopez, a resident of Michigan, at $25 a case. The sale, itself, was conducted through an intermediary, Cuddeback, and arrangements were secretly formulated by telephone. We think these factors are sufficient to support the jury's finding that Ranzoni knew the liquor was stolen. *United States v. Enoch,* 694 F.2d 465, 466 (6th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983); *United States v. Meyers,* 646 F.2d 1142, 1143 (6th Cir.1981); *Francis, supra* at 261. Cuddeback, an experienced bar owner, secretly met with Morelli and Lopez, and was present when a sale of the liquor at a price far below its actual market value was negotiated. During negotiations, both Morelli and Lopez testified, Cuddeback commented on several occasions that the alcoholic beverages were stolen and that Ranzoni had encountered serious difficulties in disposing of the liquor since the "wrong truckload was stolen." Finally Cuddeback was willing to accept a briefcase full of money, rather than use a more conventional means of financing the sale. Despite denials by Cuddeback to the contrary, we conclude there was sufficient evidence to support the jury's finding that Cuddeback knew the liquor was stolen for purposes of § 2315.

■ We similarly find no merit in appellants' contention that the government's failure to inform them about the reward received by Morelli, and its failure to assist defense counsel in locating Bob Carr, constituted *Brady* violations. Since appellants failed to request the information from the government before trial, they must show

that the evidence not disclosed by the government created a reasonable doubt about their guilt in the mind of the jury which had not existed before. *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *Perkins v. Le Fevre,* 691 F.2d 616, 619 (2d Cir.1982); *United States v. Marino,* 658 F.2d 1120, 1125 (6th Cir.1981). This they plainly cannot do. Evidence concerning the reward was introduced by the government at trial, clearly allowing the jury to consider its impact in reaching its verdict. At the same time, appellants present nothing that would suggest that the testimony of Carr would have altered the outcome of the trial. We therefore conclude appellants received a fair trial in all respects.

■ We finally have no difficulty in disposing of Cuddeback's entrapment argument. Cuddeback failed to admit each and every element of the § 2315 violation with which he was charged, a necessary prerequisite to raising an entrapment defense. *United States v. Bryant,* 716 F.2d 1091, 1094 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *United States v. Mitchell,* 514 F.2d 758, 761 (6th Cir.), *cert. denied,* 423 U.S. 847, 96 S.Ct. 86, 46 L.Ed.2d 68 (1975). Since Cuddeback did not admit that he knew the liquor was stolen; he could not assert his entrapment defense at trial and cannot raise it on appeal.

Having found each of the arguments raised by the appellants to be without merit, we affirm the district court judgment.

Affirmed.